# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Michael Rowan,**

        **Plaintiff,**

                              **Case No. 15-9227-JWL**

**v.**

**Sunflower Electric Power Corporation;**
**Mid-Kansas Electric Company, LLC; and**
**Power Constructors, Inc.,**

        **Defendants.**

## MEMORANDUM & ORDER

On August 29, 2013, plaintiff sustained electrical injuries when he was installing a guard structure under an overhead power transmission line during a utility line construction project near Medicine Lodge, Kansas. At the time of his injury, plaintiff was employed by and performing work for his employer, Track Utilities, LLC ("Track"). In this lawsuit, plaintiff asserts negligence claims against the owner of the transmission line, Mid-Kansas Electric Company, LLC ("Mid-Kansas"); the operator of the transmission line, Sunflower Electric Power Corporation ("Sunflower"); and the contractor responsible for the utility line construction project, Power Constructors, Inc. ("Power").

This matter is presently before the court on numerous motions. Plaintiff has filed a motion for partial summary judgment on defendants' respective affirmative defenses that plaintiff's claims are barred by the exclusive remedy provision of the Kansas Workers' Compensation Act. Defendants have also filed motions for summary judgment on the

exclusive-remedy defense as well as issues relating to foreseeability, breach of duty, intervening cause and punitive damages. In response to defendants' motions, plaintiff has filed a motion to ignore certain evidence submitted by defendants in support of their motions for summary judgment. Plaintiff has also moved to strike portions of the reply briefs filed by defendants on the grounds that those briefs rely on new evidence and arguments not addressed in defendants' motions and because defendants have impermissibly replied to plaintiff's responses to defendants' statements of uncontroverted facts.

As will be explained, the court grants Power's motion for summary judgment because plaintiff's claims against Power are barred by the exclusive remedy provision of the Kansas Workers' Compensation Act. Plaintiff's cross-motion on that issue is denied. Factual disputes in the record preclude the court from resolving on summary judgment whether plaintiff's claims against Mid-Kansas and Sunflower are barred by the exclusive remedy provision and, accordingly, the court denies plaintiff's motion for summary judgment on that issue and the cross-motion filed by Mid-Kansas and Sunflower. The balance of the summary judgment motion filed by Mid-Kansas and Sunflower is denied because material factual issues exist concerning foreseeability, breach, proximate cause and the availability of punitive damages. The court will address plaintiff's motions concerning evidentiary issues as pertinent below.[1]

---

[1] Several motions concerning plaintiff's expert Donald R. Johnson are also ripe and pending before the court. The Utilities' motion to strike plaintiff's expert will be resolved by separate order. Power's motions to exclude the expert's testimony and to strike or disregard the expert's affidavit are moot in light of the court's disposition of Power's motion for summary judgment.

## I. Facts

Defendant Sunflower Electric Power Corporation ("Sunflower") provides electric and transmission services to its distribution cooperatives in central and western Kansas. Sunflower operates and maintains nearly 2300 miles of transmission line and 48 substations through an operating agreement with defendant Mid-Kansas Electric Company, LLC ("Mid-Kansas"), the owner of the transmission line. Defendant Power Constructors, Inc. ("Power") is a construction contractor in the electrical utility industry and regularly contracts with utility companies for, among other services, the construction of transmission lines.

In March 2008, Power entered into a Master Services Agreement with Sunflower and Mid-Kansas.[2] That agreement expressly requires Power to "perform all design and construction services, and provide all material, equipment, tools and labor, necessary to complete the Work as [Sunflower] may from time to time request." The agreement defines the "contract documents" to include "any task orders or Change Orders modifying or setting forth a scope of Work." The agreement further requires that Power "shall provide through itself or Subcontractors the necessary supervision, labor, inspection, testing, start-up, material, equipment, machinery, temporary utilities and other temporary facilities to permit [Power] to complete construction" of a given project.

In 2012, Sunflower and Mid-Kansas initiated a large project which involved constructing and rebuilding over 70 miles of transmission line. That project was divided into several

---

[2] The agreement identifies Sunflower as the "Owner" but the agreement expressly applies equally to all "Owner Affiliates," including Mid-Kansas Electric Company, LLC, which is identified in the agreement as an Owner Affiliate.

"smaller" projects or phases, many of which were contracted separately between Power and Sunflower/Mid-Kansas. Pertinent here, and as contemplated by the Master Services Agreement, Power and Sunflower/Mid-Kansas executed a task order covering one segment of the 70-mile project.[3] That task order defined the project as the "Harper to Barber 138kV Transmission Line Rebuild" and identified the "scope of services" to include providing "construction services to rebuild the 138kV transmission line from Harper Substation to the newly constructed Barber Substation."[4] Paul Mehlhaff was Sunflower's project manager for the project and James Stovall was Power's "on-site representative" for the project. Power, in turn, subcontracted a portion of its work on the project—the construction of the transmission line from Barber Substation to Flat Ridge Substation—to Track Utilities, LLC.

On August 19, 2013, a pre-construction meeting was held and was attended by representatives from Power, Sunflower and Track. Mr. Stovall attended on behalf of Power; Mr. Mehlhaff attended on behalf of Sunflower; and plaintiff, Daryl Kimmel, Randal Miller and Matt Heath attended on behalf of Track. Mr. Kimmel was the general foreman for the Track crew on

---

[3] The task order expressly states that it is an "affiliate" transaction—that "Sunflower is entering this Agreement as agent for and on behalf of Mid-Kansas Electric Company, LLC."

[4] In its Statement of Fact No. 4, Power refers to the Master Services Agreement and the task order collectively as the "Power Contract." But while Power references the task order in its Statement of Fact No. 4, it fails to cite to the particular exhibit that is the task order. Plaintiff, then, controverts Statement of Fact No. 4 on basis that the "Power Contract" does not exist because the task order is not attached to the Master Services Agreement and is not otherwise included as an exhibit referenced in the Statement of Fact. But Power has submitted the task order with its motion for summary judgment and references that task order by exhibit number in other portions of its motion. Moreover, plaintiff does not dispute that the exhibit submitted by Power is in fact what Power represents it is—the task order for the specific project at issue in this case. The court, then, rejects plaintiff's attempt to create a factual dispute concerning the existence or significance of the task order.

the project and Mr. Heath was Track's project manager.  Plaintiff and Mr. Miller were both apprentice linemen employed by Track.  At the meeting, the scope of the project and the construction schedule were discussed.  The project "start date" was identified as August 19, 2013 and the outage schedule for the Barber to Flat Ridge transmission line was established as October 1, 2013 through November 5, 2013.  Sunflower's evidence suggests that Track was specifically instructed that it could not build or erect guard structures until the outage on October 1, 2013.[5]  Plaintiff's evidence, however, suggests that Track notified Sunflower at the pre-construction meeting of its intent to build and erect guard structures prior to the outage.

On August 29, 2013, Mr. Rowan and other members of Track's crew, in connection with the Barber to Flat Ridge project, were building a guard structure underneath an energized, uninsulated transmission line.  At some point, Mr. Rowan lost control of a wooden pole that he was attempting to maneuver and the pole made contact with the overhead line.  Mr. Rowan sustained electrical injuries as a result.

Additional facts will be provided as they related to the specific arguments raised by the parties in their submissions.

## II.    Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the

---

[5] A guard structure is used during line construction to prevent lines from impeding traffic on the road when they are slacked during construction.  A guard structure typically consists of two vertical wooden utility poles and a wooden crosspiece placed on either side of the intersecting road.

moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id.* at 1143-44.

The legal standard does not change if the parties file cross-motions for summary judgment. Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *Atlantic Richfield Co. v. Farm Cr. Bank*, 226 F.3d 1138, 1148 (10th Cir. 2000).

## III.    Exclusive Remedy/Statutory Employer

Defendants assert that plaintiff's claims are barred by the Kansas Workers' Compensation Act, K.S.A. § 44–501 et seq. In pertinent part, the Kansas Workers' Compensation Act provides:

> Except as provided in the workers compensation act, no employer, or other employee of such employer, shall be liable for any injury . . . for which compensation is recoverable under the workers compensation act nor shall an employer be liable to any third party for any injury or death of an employee which was caused under circumstances created a legal liability against a third party and for which workers compensation is payable by such employer.

K.S.A. § 44–501b(d). This section, commonly known as the exclusive remedy provision, precludes workers who can recover under the act from bringing a common law negligence action against an employer or fellow employee. *See Herrell v. National Beef Packing Co.,* 259 P.3d 663, 674 (Kan. 2011) (quoting *Hollingsworth v. Fehrs Equip. Co.,* 729 P.2d 1214 (Kan. 1986)). The exclusive remedy provision of the Workers' Compensation Act also applies to situations involving contractors and subcontractors. K.S.A. § 44–503(a) provides:

> Where any person (in this section referred to as the principal) undertakes to execute any work which is a part of the principal's trade or business or which the principal has contracted to perform and contracts with any other person (in this section referred to as the contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any worker employed in the execution of the work any compensation under the workers compensation act which the principal would have been liable to pay if that worker had been immediately employed by the principal.

Section 44–503(a) extends the application of the act to certain entities which are not the immediate employers of the injured worker, but rather are "statutory employers." *Robinett v. Haskell Co.*, 12 P.3d 411, 414 (Kan. 2000).

All three defendants assert that plaintiff's claims are barred because they qualify as "statutory employers" under the act. Sunflower and Mid-Kansas assert in their motion for summary judgment that they qualify as statutory employers because the work that gave rise to plaintiff's injury was part of their "trade or business" under the first alternative set forth in § 44-503(a). Power asserts in its motion for summary judgment that it qualifies as a statutory employer because the work that gave rise to plaintiff's injury was work that Power had "contracted to perform" under the second alternative set forth in § 44-503(a). According to defendants, then, summary judgment is appropriate because plaintiff's claims are barred by §

44-501b(d).[6]  Plaintiff, on the other hand, contends that he is entitled to summary judgment on this defense because the uncontroverted facts demonstrate that none of the defendants qualify as statutory employers.  As will be explained, material fact issues exist as to whether Sunflower and Mid-Kansas are statutory employers and the court denies the parties' cross-motions for summary judgment on that issue.  With respect to Power, the uncontroverted evidence demonstrates that Power was plaintiff's statutory employer such that plaintiff's exclusive remedy lies under the Workers' Compensation Act.  Power's motion for summary judgment, then, is granted and plaintiff's motion with respect to Power is denied.

A.      *Sunflower/Mid-Kansas*

Sunflower and Mid-Kansas (collectively, the "Utilities") assert that they are plaintiff's statutory employer because the work that gave rise to plaintiff's injury was part of the Utilities' "trade or business" under the first alternative set forth in § 44-503(a).  The Utilities and plaintiff have both moved for summary judgment on this issue and they agree on the applicable tests utilized by Kansas courts in resolving the issue.  In *Hanna v. CRA, Inc.*, 409 P.2d 786 (Kan. 1966), the Kansas Supreme Court set forth the following tests to determine whether the work being performed is a part of the principal's trade or business:

> (1) Is the work being performed by the independent contractor and the injured employee necessarily inherent in and an integral part of the principal's trade or business?

---

[6] The parties do not dispute that an injured worker may have more than one statutory employer in an "employment pyramid."  *See Selle v. Boeing Co*., 840 P.2d 542, 544 (Kan. Ct. App. 1992) (if an employer qualifies as a statutory employer under the act, he should receive protection regardless of whether another employer is also a statutory employer).

(2)　Is the work being performed by the independent contractor and the injured employee such as would ordinarily have been done by the employees of the principal?

*Id*. at 789.　The *Hanna* court further noted that "[i]f either of the foregoing questions is answered in the affirmative the work being done is part of the principal's 'trade or business,' and the injured employee's sole remedy against the principal is under the Workmen's Compensation Act." *Id*.　The test, then, is a disjunctive one and the Utilities need only satisfy one of the *Hanna* tests.　*Price ex rel. Price v. Western Resources, Inc*., 232 F.3d 779, 785 n.4 (10th Cir. 2000) (applying Kansas law).

In *Bright v. Cargill, Inc*., 837 P.2d 348, 359 (Kan. 1992), the Kansas Supreme Court clarified that the question under the first *Hanna* test is not whether the subcontractor's work is useful, necessary or even indispensable to the principal's business.　Rather, the first *Hanna* test is whether other similar businesses use their own employees to perform the kind of work that was being performed by the injured worker or whether similar businesses contract out that kind of work.　*Id*.　The second *Hanna* test is met where it is "shown that the employees of the principal ordinarily do the type of work that was being done by the injured" worker.　*Price*, 232 F.3d at 787.　Thus, the first test looks to industry practice and the second test looks at the individual principal's practice.　*Id*.　Both tests are intended to prove the same fact—that the work being done was "part of the principal's trade or business." *Id*.

1.　First *Hanna* Test

The court first examines the parties' arguments and evidence relating to industry practice. While the Utilities assert that they are entitled to summary judgment under both *Hanna* tests,

they have come forward with no evidence or argument relating to industry practice under the first *Hanna* test. Rather, the Utilities' evidence relates solely to the Utilities' own practices. The Utilities, then, have not shown that they are entitled to summary judgment under the first *Hanna* test. Plaintiff's motion for summary judgment on this issue is based entirely on the affidavit and report of his liability expert, Donald R. Johnson. Mr. Johnson opines that when "smaller utilities" like Sunflower and Mid-Kansas undertake projects of the same magnitude as the 70-mile project in this case, those utilities typically do not maintain sufficient in-house resources to perform the work such that those types of projects are necessarily performed by independent contractors. Plaintiff's argument, then, broadly frames the pertinent "work" by examining the project as a whole.

Plaintiff directs the court to no authority supporting his interpretation of the applicable "work." Indeed, none of the parties have briefed the issue of whether that focus is appropriate or whether "the work" is more appropriately determined by examining the specific task or activity performed by plaintiff at the time of the injury. The Court in *Bright,* relying on Larson's treatise, suggested that the appropriate focus is the specific activity being performed at the time of the injury:

> [T]he test is not one of whether the *subcontractor's activity* is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction or transportation service. The test . . . is whether *this* indispensable *activity* is, in that business, normally carried on through employees rather than independent contractors.

*Bright*, 837 P.2d at 359 (quoting 1C Larson, *Workmen's Compensation Law* § 49.16(j), pp. 9–105 to 9–106 (1991)) (emphasis added). Similarly, the Tenth Circuit in *Price ex rel. Price v. Western Resources, Inc*., 232 F.3d 779 (10th Cir. 2000) limited its focus for purposes of its

*Hanna* analysis to the specific task that the injured worker was performing at the time of the accident—"analyzing the circuit breaker and switchgear and helping with repairs." *Id.* at 786 (evidence concerning manufacture and overhaul of circuit breakers irrelevant where injured worker was only repairing circuit breaker); *accord Dunn v. Corning, Inc.*, 575 F.ed Appx. 644, 648-49 (6th Cir. 2014) (fact that major expansion project was beyond what defendant could perform with its own employees was not relevant where plaintiff's only task on project was to run conduit and defendant's employees routinely ran conduit in plant; agreeing with the defendant's argument that it was "improper to distinguish between running conduit for a large-scale expansion project and running conduit for regular and recurrent maintenance at the plant") (applying Kentucky law).

Plaintiff, then, has not satisfied the court that the appropriate focus for purposes of the first *Hanna* test is the scope and size of the overall project at issue as opposed to the specific task that plaintiff was performing at the time of the accident—building and erecting guard structures. He is not entitled to summary judgment on this issue.


2.     Second *Hanna* Test

Plaintiff's motion for summary judgment under the second *Hanna* test suffers from the same deficiency—it focuses on evidence suggesting that the Utilities routinely completed large projects such as the one at issue here through independent contractors rather than their own employees.[7] Because the court is not persuaded that plaintiff's evidence is focused on the

---

[7] Plaintiff further contends that Mid-Kansas cannot establish that plaintiff was injured doing work that normally would have been done by its employees because Mid-Kansas has no

appropriate work, plaintiff has not demonstrated that he is entitled to summary judgment. For similar reasons, the Utilities have not shown that they are entitled to summary judgment. While they have come forward with evidence that their employees were capable of a wide range of high-voltage transmission work, that evidence does not speak to whether the Utilities' employees ordinarily build and erect guard structures as part of that work. None of the parties, then, is entitled to summary judgment under the second *Hanna* test.[8]

B.     *Defendant Power Constructors, Inc.*

As noted earlier, Power contends that it is plaintiff's statutory employer because the work that gave rise to plaintiff's injury was work that Power had "contracted to perform" under the second alternative set forth in § 44-503(a). The threshold issue presented by the parties' cross-motions for summary judgment is whether § 44-503(a) even contains a second alternative—plaintiff asserts that no such alternative exists and that Power must establish itself as a statutory employer, if at all, under the *Hanna* tests used to determine whether the work that gave rise to plaintiff's injury was "part of the principal's trade or business." The court rejects this argument. The plain language of § 44-503(a) clearly contains two distinct alternatives under which an

---

employees. Factual issues exist concerning the affiliation between Mid-Kansas and Sunflower, including whether those entities share employees. Those issues preclude the entry of summary judgment in plaintiff's favor as to Mid-Kansas.

[8] In resolving the parties' cross-motions for summary judgment on the statutory employer issue, the court did not consider any evidence submitted by the Utilities to which plaintiff lodged an objection in his motion to ignore inadmissible evidence—namely, Clarence Suppes' declaration and Mr. Mehlhaff's declaration. This motion, then, is moot to the extent it relates to evidence submitted by the Utilites.

entity may be deemed a statutory employer. Kansas courts have recognized this distinction on several occasions. In *Harper v. Broadway Mortuary*, 634 P.2d 1146 (Kan. Ct. App. 1981), the defendant had contracted with a customer for a funeral. In furtherance of that contract, the defendant contracted with Air Capitol Escort Service to provide a motorcycle escort for the funeral procession. *Id.* at 1147. Floyd Harper was employed by Air Capitol Escort Service as a motorcycle escort rider and he was killed when his motorcycle fell during the funeral procession. *Id.* The workmen's compensation administrative law judge ruled that the claim filed by Mr. Harper's spouse was not compensable because the escort service was not "part of the trade or business" of the defendant. *Id.* The workmen's compensation director reversed that ruling on the grounds that whether the escort service was "part of the trade or business" of the defendant was irrelevant because the escort service was "contracted for by a third party." *Id.* at 1148. The director's award was affirmed by the district court. *Id.*

The Kansas Court of Appeals affirmed the district court's order. *Id.* After setting forth the language of § 44-503(a),[9] the court summarized as follows:

> This statute provides that a principal will be liable to the employee of a subcontractor if the principal undertakes to do work which (1) is a part of the principal's trade or business; or (2) the principal has contracted to do for a third party. The instant case falls into the second category.

*Id.* The Kansas Court of Appeals expressly agreed with the workmen's compensation director's "conclusion that it was irrelevant whether the work was a part of the principal's trade or business." *Id.* As explained by the court:

---

[9] K.S.A. § 44-503(a) "has been a part of Kansas workers compensation law in essentially the same form since its enactment in 1927." *See Robinett v. Haskell Co.*, 12 P.3d 411, 414 (Kan. 2000).

> [Defendant] had contracted with a customer to provide a motorcycle escort for the funeral procession. In order to perform this contract obligation, [defendant] could either have hired an employee to ride as escort, or it could subcontract the work to a local escort service. [Defendant] chose the latter course. . . . By contracting to provide an escort service for a third party, [defendant] made the work a part of its business.

*Id.* The court concluded by reiterating that it was "unnecessary" for the director or the trial court to determine whether the escort service was an inherent part of the defendant's trade or business or if that service was ordinarily done by employees of the principal. *Id.*

Plaintiff contends that *Harper* is not persuasive because it represents "pre-*Bright*" case law that has been "disavowed" by Kansas courts. But the Kansas Court of Appeals, long after *Bright*, has continued to recognize two distinct alternatives in § 44-503(a) and has relied on *Harper* in doing so. *See Wheeler v. Rolling Door Co.*, 109 P.3d 1255 (Kan. Ct. App. 2005). In *Wheeler*, the Kansas Court of Appeals considered separately each of the two alternatives set forth in § 44-503(a) because the parties' summary judgment submissions raised arguments under both alternatives. *Id.* at 1259. The court held that the plaintiff was entitled to partial summary judgment on the statutory employer issue under the "first alternative" of § 44-503(a) because the defendant had not come forward with evidence establishing a genuine issue of material fact under the *Hanna* tests. *Id.* at 1261-63.

But the court next examined the "second alternative" of § 44-503(a)—what it called the "contracting out contracted work" portion of the statute. *Id.* at 1263. The court reversed the trial court's ruling that the defendant had not met its burden of proof on this theory. In doing so, the court relied on *Harper* to explain that the "first portion of K.S.A. 44-503(a) did not have to be applied" when the "contracting out contracted work" portion of the statute applied. *See id.* at

1264. Under the second alternative of the statute, the court explained that the question to be addressed was whether the principal had contracted with a third party to perform the services that the injured worker was performing and whether the principal in turn had subcontracted with the injured worker's immediate employer for those services. *Id.* Ultimately, the court held that although the evidence did not conclusively establish that the principal was a statutory employer under the "contracting out contracted work" portion of the statute, material questions of fact precluded the entry of summary judgment for the injured worker. *Id.*; *accord Rodriguez v. John Russell Constr.*, 826 P.2d 515, 519-20 (Kan. Ct. App. 1991) (recognizing two separate alternatives under § 44-503(a)).

Clearly, then, the court cannot simply ignore *Harper* as a pre-*Bright* aberration in Kansas case law. And while the Kansas Supreme Court has not squarely addressed the second alternative under § 44-503(a), it has certainly recognized that alternative. In clarifying the *Hanna* test in *Bright*, for example, the court expressly endorsed the following language from Larson's treatise on workers' compensation:

> [T]he test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction or transportation service. The test (*except in cases where the work is obviously a subcontracted fraction of a main contract*) is whether this indispensable activity is, in that business, normally carried on through employees rather than independent contractors.

837 P.2d at 359 (quoting 1C Larson, *Workmen's Compensation Law* § 49.16(j), pp. 9–105 to 9–106 (1991)) (emphasis added). The highlighted language demonstrates that the *Bright* court did not intend the *Hanna* tests to apply to those cases that fall under the "contracting out contracted work" portion of the statute.

Additional support for this conclusion is found in *Robinett v. Haskell Co.*, 12 P.3d 411 (Kan. 2000). In that case, the Kansas Supreme Court summarized a portion of the trial court's holding as follows:

> The trial court found, and neither party seriously disputes, that Haskell, as the principal contractor, would qualify as the plaintiff's "statutory employer" under K.S.A. 44–503(a). The trial court found that work done by subcontractor Stanley Jones was part of Haskell's trade or business and, further, that the work was part of a contract that Haskell had contracted to do for a third party, Armour Swift Eckrich. On appeal, the plaintiff does not argue that this finding was incorrect.

*Id.* at 415. The Tenth Circuit, applying Kansas law, has relied on *Robinett* for the principle that a "general contractor is a statutory employer of a subcontractor's employees." *See Anderson v. Commerce Constr. Servs., Inc.*, 531 F.3d 1190, 1193 (10th Cir. 2008). Judges in this District have also recognized and applied the second alternative found in § 44-503(a*). See Zendejas v. Val Energy, Inc.*, 2014 WL 1309075, at *3 (D. Kan. Mar. 31, 2014) (where defendant had implied-in-fact contract with third party to transport rig and subcontracted transportation of rig to injured worker's immediate employer, injured worker was statutory employee of defendant; worker was performing work that defendant had contracted to do for a third party, satisfying one of two alternatives for statutory employment under § 44-503(a)); *Anderson v. Commerce Constr. Servs., Inc.*, 2007 WL 1099629, at * (D. Kan. Apr. 10, 2007) (applying second alternative and granting summary judgment to defendant where defendant executed construction contract with school district which required demolition work and then subcontracted demolition work to plaintiff's employer), *aff'd*, 531 F.3d 1190 (10th Cir. 2008).

As should be clear by this weight of authority, then, Power need not rely on the *Hanna* tests to establish a statutory employment relationship with plaintiff and the court rejects

plaintiff's suggestion that these cases are simply "outlier" cases. *See also* 4-70 *Larson's Workers' Compensation Law* § 70.06[2] & n.9 (2017) ("Under the Kansas statute, the statutory employer clause applies when the principal has contracted to perform a particular service for a third party and then subcontracts this service—and in such a case it need not be proved that the subcontracted service was part of the principal's trade or business."). Because plaintiff's motion for summary judgment with respect to Power is based solely on Power's purported inability to satisfy the *Hanna* tests, that motion is necessarily denied.[10]

Under the second alternative contained in the exclusive remedy provision of the Workers' Compensation Act, Power is deemed a statutory employer of plaintiff if Power executed a contract with Sunflower; the contract called for work that Power subcontracted to Track; and plaintiff was injured while performing that work. Plaintiff's own evidence demonstrates that Track was the subcontractor that Power hired to replace and reconstruct the transmission and distribution lines on the Barber to Flat Ridge phase of the Barber to Harper project and that plaintiff, a Track employee, was injured while performing that work. The only issue, then, is whether the subcontracted work was part of Power's contract with Sunflower.

With respect to that issue, no material factual disputes exist. Plaintiff does not contest that Power entered into a Master Services Agreement with Sunflower and Mid-Kansas in March 2008. Indeed, plaintiff has submitted that agreement with his response to defendant's motion.

---

[10] Plaintiff suggests that the second alternative does not exist because numerous Kansas cases addressing whether general contractors are statutory employers analyze that issue under the *Hanna* tests without reference to the second alternative. But one "might reasonably speculate that these decisions were reached in terms of the principal's trade or business because of the manner in which the issue was presented to the court." *See* Kan. Bar Ass'n, *Kansas Workers Compensation* § 4.10 (Tom Hammond et al. eds., 4th ed. 2000).

That agreement expressly requires Power to "perform all design and construction services, and provide all material, equipment, tools and labor, necessary to complete the Work as [Sunflower] may from time to time request." The agreement defines the "contract documents" to include "any task orders or Change Orders modifying or setting forth a scope of Work." Finally, the agreement requires that Power "shall provide through itself or Subcontractors the necessary supervision, labor, inspection, testing, start-up, material, equipment, machinery, temporary utilities and other temporary facilities to permit [Power] to complete construction" of a given project. As contemplated by the Master Services Agreement, Power and Sunflower/Mid-Kansas executed a task order setting forth the specific project at issue in this case. That task order defined the project as the "Harper to Barber 138kV Transmission Line Rebuild" and identified the "scope of services" to include providing "construction services to rebuild the 138kV transmission line from Harper Substation to the newly constructed Barber Substation." Power, then, clearly contracted with Sunflower to provide construction services on the "Harper to Barber" transmission line rebuild project and it is undisputed that Power subcontracted a portion of that work—the construction of the transmission line from Barber Substation to Flat Ridge Substation—to Track.

Significantly, plaintiff does not dispute the few facts that are pertinent to the resolution of the statutory employer issue as it relates to Power.[11] Plaintiff's primary argument is that Power was not a "general contractor" on the project but merely a "consultant" on the project. But

---

[11] In resolving Power's motion for summary judgment on the statutory employer issue, the court was not required to and did not consider any evidence submitted by Power to which plaintiff lodged an objection either in his motion to ignore inadmissible evidence or his motion to ignore portions of Power's reply in support of Power's motion for summary judgment. Those motions, then, are moot to the extent they relate to evidence submitted by Power.

plaintiff offers no persuasive argument that the distinction is one that makes a difference. The second alternative of K.S.A. § 44-503(a) does not limit its application to "general contractors" and, as plaintiff suggests, there is no special rule for "general contractors" in determining whether an entity is a statutory employer. Regardless of whether an entity is properly considered a "general contractor" or a "consultant" or any other particular label a party might ascribe to it, that entity is a statutory employer under the statute if the entity contracts with a third party to perform work and then subcontracts a portion of that work to the injured worker's immediate employer. Plaintiff cannot reasonably dispute that Power—even assuming Power was a "consultant" on the project as opposed to a general contractor—had a contract with Sunflower to provide construction services on the project; that Power subcontracted a portion of that work to Track; and that plaintiff, Track's employee, was injured when he was performing that work. Because the evidence undisputedly demonstrates that Power had a contractual obligation to provide construction services to Sunflower which it then delegated to Track, Power is plaintiff's statutory employer under K.S.A. § 44-503(a) and plaintiff's exclusive remedy lies under the Kansas Workers' Compensation Act. Power's motion for summary judgment is granted.

## IV. Negligence Claims Against Utilities

In the pretrial order, plaintiff contends that he sustained injuries as a result of the Utilities' negligence. The familiar elements of a negligence claim are (1) the defendant owed a duty to the plaintiff; (2) the defendant breached this duty; (3) the breach was the proximate cause of the plaintiff's injury; and (4) the plaintiff sustained injuries. *See Hesler v. Osawatomie*

*State Hosp.*, 971 P.2d 1169, 1174 (Kan. 1999)). In support of plaintiff's claim, he asserts that the Utilities departed from the applicable standard of care in numerous respects, including their failure to comply with their own safety policies and the minimum standards for safety set forth in the National Electric Safety Code (NESC); failure to heed warnings about Track's inexperienced crew; failure to warn plaintiff that the settings utilized on the transmission line would not "trip" even in the event of significant contact with the line; failure to de-energize the transmission line prior to plaintiff's work under the line; failing to communicate effectively with Power and Track regarding the nature and extent of Track's work; failure to maintain a trained and experienced Utilities' employee on the job site; and failure to take certain precautions prior to the performance of the work, such as insulating the lines under which work was being performed and limiting the line-to-ground fault current. Plaintiff contends that one or more of these specific negligent acts proximately caused his injuries. In the alternative, plaintiff asserts in the pretrial order that he may prove his case under the *res ipsa loquitur* doctrine, which provides an exception to the usual requirement that specific acts of negligence must be shown. *See* Dan B. Dobbs, et al., *The Law of Torts* § 169 (2d ed. 2011).

In their motion for summary judgment, the Utilities contend that they owed no duty to plaintiff because plaintiff's accident and injuries were not foreseeable; that no breach of any duty occurred by virtue of the Utilities' failure to warn plaintiff, failure to de-energize the line or failure to insulate the line; that no acts or omissions of the Utilities proximately caused plaintiff's injuries; and that plaintiff cannot establish willful or wanton conduct on the part of the

Utilities for purposes of his claim for punitive damages.[12]  Those arguments are analyzed below.

The Utilities have not moved for summary judgment on the *res ipsa loquitur* theory of proof

and, instead, raise that issue for the first time in their reply brief.  The court doubts whether the

principle is appropriately applied here.  Nonetheless, that issue must be resolved at trial in light

of the Utilities' failure to advance their argument in a timely fashion.  *Lynch v. Barrett*, 703 F.3d

1153, 1160 n.2 (10th Cir. 2013) (court does not consider arguments raised for the first time in

reply brief).  This aspect of plaintiff's motion to strike the Utilities' reply is granted.[13]


A.     *Forseeability*


---

[12] The Utilities also move for summary judgment on the grounds that they cannot be held vicariously liable for the torts of Track.  As plaintiff points out in response, plaintiff is not asserting a claim of vicarious liability against the Utilities; plaintiff alleges direct negligence on the part of the Utilities.  The Utilities seem to have abandoned this argument in their reply brief.

The Utilities further suggest that summary judgment is required because Track did not notify the Utilities of its intent to work underneath energized power lines.  The Utilities assert that the Kansas Overhead Power Line Accident Prevention Act required Track to provide written notice to the Utilities.  This argument was raised for the first time in the Utilities' reply brief and the court does not consider it.  *Lynch v. Barrett*, 703 F.3d 1153, 1160 n.2 (10th Cir. 2013) (court does not consider arguments raised for the first time in reply brief).  This aspect of plaintiff's motion to strike the Utilities' reply is granted.

[13] In their reply, the Utilities contend that plaintiff has waived the right to proceed under the *res ipsa loquitur* theory of proof because that theory was never asserted until the pretrial conference. While the Utilities apparently objected to the inclusion of this theory in the pretrial order on that basis, the magistrate judge overruled that objection.  The magistrate judge indicated that the Utilities "could preserve" that issue by filing a motion in limine or a summary judgment motion. For whatever reason, the Utilities failed to raise the issue in their motion for summary judgment and failed to file an objection to the pretrial order.  And with due respect to the magistrate judge, the court would not entertain that objection through the filing of a motion in limine.  This issue must now await a Rule 50 motion at trial.

In their motion for summary judgment, the Utilities assert that they owed no duty to plaintiff because the probability of harm was not foreseeable. *See Berry v. National Med. Servs., Inc.*, 257 P.3d 287, 290 (Kan. 2011) (to find a legal duty to support a negligence claim, the probability of harm must be foreseeable). The Utilities' argument is based on their characterization of the record evidence as follows: they had no knowledge that Track would build guard structures prior to the scheduled outage without the Utilities' approval; they had no knowledge that Track employees would cut the wooden pole so that, when erected, it was the same height as the overhead line; they had no knowledge that plaintiff would lose his footing while maneuvering the pole; they had no knowledge that plaintiff would not be wearing insulated gloves at the time of the accident; and they had no knowledge that Track would fail to properly ground the truck. Essentially, then, the Utilities contend that they had no knowledge that plaintiff would be erecting poles under an energized line or that Track would depart from well-established safety protocols in doing so.

The Utilities rely on *Moseley v. Kansas City*, 228 P.2d 699 (Kan. 1951) to support their argument. In that case, a sixteen-year-old boy climbed a utility pole (located at the intersection of two city streets) at 4:30am and made contact with an energized line, resulting in his death. The Supreme Court of Kansas rejected the plaintiffs' negligence claim on the grounds that the utility owed no duty to the boy because it was not foreseeable to the utility that the boy would climb the pole. *Id.* at 705. As explained by the court, the boy was "properly regarded as a trespasser" and the utility undisputedly had no knowledge of his presence at the pole until after his death. *Id.* The distinction between Moseley and the facts presented here should be

obvious—the Utilities knew that Track was performing work on the project and that work would be occurring on and under transmission lines.

Moreover, material factual disputes exist with respect to the Utilities' contention that they had no knowledge that Track would build the guard structures prior to the scheduled outage. Mr. Kimmel and Mr. Heath both testified that the "plan" was to build the guard structures prior to the outage in an effort to save time once the lines were de-energized (other evidence reflects that the Utilities wanted to have as much work done as possible prior to any outages to reduce the length of any outages) and that both Power and the Utilities were aware of that plan through conversations that Mssrs. Kimmel and Heath had with Jim Stovall. Mr. Miller, another Track employee, testified that Mr. Kimmel explained to the Track crew during the pre-construction meeting, in the presence of Mr. Stovall and Mr. Mehlhaff, that Track would build the guard structures prior to the outage so that that work would be completed before the outage occurred. The Utilities urge that Mr. Miller's testimony is contradicted by other evidence in the record—but that, of course, simply highlights that a factual question exists for the jury to resolve. Viewed in the light most favorable to plaintiff, then, the evidence is clearly sufficient to permit a reasonable jury to conclude that the Utilities had knowledge that Track planned to build guard structures under the transmission line prior to the scheduled outage.

The court also rejects the Utilities' argument that no duty existed because, even assuming that they knew that Track would build guard structures prior to the outage, they undisputedly did not know that Track would depart from safety protocols in doing so. In making that argument, the Utilities misconstrue the law concerning foreseeability. The foreseeability issue focuses not on whether the Utilities should have anticipated the particular act from which the injury resulted

(e.g., cutting the pole at a certain length; plaintiff's loss of footing) but whether the Utilities "should have foreseen the probability that injury might result from any reasonable thing that might be done upon the property by persons who had a right to go there, for either work, pleasure, or business." *Cerretti v. Flint Hills Rural Elec. Co-op. Ass'n*, 837 P.2d 330, 335 (Kan. 1992) (citing *Henderson v. Kansas Power & Light Co.*, 339 P.2d 702 (1959)). Because the evidence is sufficient to permit a jury to conclude that the Utilities' knew that Track would be building guard structures under an energized line, the jury could also conclude that plaintiff's accident and injury was reasonably foreseeable to the Utilities. The Utilities' arguments concerning Track's failure to cut the pole to an appropriate length or plaintiff's failure to wear insulated gloves are really arguments that Track's negligence or plaintiff's own negligence contributed to or caused plaintiff's accident. Those arguments, then, are for the jury to resolve. *See Reynolds v. Kansas Dept. of Transportation*, 273 Kan. 261, 269, 43 P.3d 799 (2002) (for purposes of comparative fault, "a party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the injury or damages for which claim is made").

B.      Breach

The Utilities contend that no breach of duty can be established by virtue of the Utilities' failure to warn plaintiff about the dangers of working under an energized line; failure to de-energize the line while plaintiff was building a guard structure under it; and failure to insulate the line while plaintiff was building a guard structure under it. The Utilities, then, move for

summary judgment on these three specific acts alleged by plaintiff.  The court discusses each in turn.[14]

## 1.    Failure to Warn

The Utilities contend that they were not required to warn plaintiff of the obvious risks of working near an energized power line.  But plaintiff does not assert that the Utilities failed to warn plaintiff of the inherent risks of working near an energized line.  Rather, plaintiff contends that the Utilities failed to warn plaintiff that the settings utilized on the line would not "trip" in the event of significant contact with the line and that current would continue to run through the line even after initial contact.  That is an issue that is not addressed by the Utilities in their motion.  Because the Utilities' motion for summary judgment is not tied to the specific allegation made by plaintiff, the motion must be denied.

## 2.    Failure to De-Energize Line

The Utilities assert that their obligation to de-energize a transmission line arises only upon "knowledge of a condition that will clearly cause immediate danger unless the line is de-energized."  According to the Utilities, the record is devoid of any evidence of a condition likely to cause immediate danger and is devoid of any evidence that the Utilities had knowledge of any

---

[14] The Utilities move for summary judgment to the extent plaintiff attempts to assert a separate "negligent hiring" claim against the Utilities based on their involvement in the decision to award Track a portion of the work.  In response, plaintiff explains that he is not asserting a separate claim for negligent hiring but is alleging that the Utilities' participation in the decision to select Track for work on the project is a negligent act that supports plaintiff's general negligence claim.  The Utilities have not replied to that issue in any respect and, thus, the court presumes that the Utilities are satisfied with the distinction drawn by plaintiff.

such condition. In support of their motion, the Utilities direct the court to evidence that the power outage was scheduled for October 1, 2013; that Track knew that the lines would not be de-energized until that time; that the Track was required to provide a one-week notice to the Utilities prior to beginning any work underneath the lines; and that Track was expressly told by Sunflower that they could not build any guard structures under lines until after the scheduled outage. The Utilities, then, assert that Track never provided notice of their intent to work under the lines such that the Utilities had no reason to de-energize the line prior to the scheduled October 1, 2013 outage.

As explained above in connection with the Utilities' foreseeability argument, the Utilities have not shown the absence of disputed facts concerning their knowledge of whether Track would be working under energized lines prior to October 1, 2013. Mr. Kimmel and Mr. Heath both testified that Power and the Utilities were aware of Track's intent to build guard structures prior to the scheduled outage. Mr. Miller testified that Track's plan was discussed during the pre-construction meeting in the presence of Mr. Mehlhaff. Viewed in the light most favorable to plaintiff, this evidence is clearly sufficient to permit a reasonable jury to conclude that the Utilities had knowledge that Track planned to build guard structures under the transmission line prior to the scheduled outage. A jury, then, must decide whether the Utilities' failure to de-energize the line in light of those circumstances violated the applicable standard of care.[15]

---

[15] While the Utilities essentially concede in their reply that plaintiff's evidence shows that Track provided notice of their intent to build the guard structures prior to the outage, they contend that they are still entitled to summary judgment because there is no evidence that the Utilities ever "approved" Track's plan and because it is undisputed that Track did not ask the Utilities to de-energize the line on the day of the accident. But the Utilities' motion was limited to the

3.      Failure to Insulate Line[16]

The Utilities contend that the scope of their duty to insulate a transmission line is essentially a question of foreseeability and, accordingly, that they had no duty to insulate the line because they had no knowledge that plaintiff would be building a guard structure prior to the outage;  they had no knowledge that plaintiff would erect a pole that, when vertical, was the same height as the overhead line; they had no knowledge that plaintiff would fail to wear insulated gloves during the work; and they had no knowledge that plaintiff would lose his footing and trip during the work.  As previously explained, factual issues exist as to the Utilities' knowledge that Track would be building the guard structures prior to the outage.  And the court has previously rejected the Utilities' remaining arguments concerning foreseeability.

The Utilities also contend that their duty to insulate is satisfied so long as they maintain (as they contend they did) the transmission lines at a sufficient height to eliminate the likelihood of contact with them.  In support of this argument, the Utilities rely on *Henderson v. Kansas Power & Light Co*., 339 P.2d 702 (Kan. 1959).  But the court in *Henderson* held that a jury was required to resolve whether the utility had maintained its wires at a sufficient height such that there was no reason to anticipate that contact would be made with them.  *Id*. at 709.  Moreover,

---

Utilities' purported lack of knowledge of Track's intent to build guard structures prior to the scheduled outage—an issue on which factual issues exist.

[16] The Utilities contend that plaintiff has waived his right to present evidence on this particular negligent act because the allegation was not raised in discovery.  This asserted negligent act was included in the pretrial order over the Utilities' objection.  Because the Utilities have not provided the court with any record upon which it might resolve the objection, the objection is overruled.

*Henderson* analyzed the utility's duty to insulate power lines vis-à-vis the general public as opposed to a utility's duty to insulate power lines vis-à-vis contractors who are performing work on and under the power lines at the direction of the utility.[17]  In any event, in light of plaintiff's evidence that the Utilities knew that Track was building guard structures and maneuvering wooden poles under the energized line, they cannot demonstrate on summary judgment that the line was maintained at a height that would eliminate the risk of contact with the line.  This aspect of the Utilities' motion, then, is denied.

*C.      Causation*

The Utilities seek summary judgment on plaintiff's negligence claims on the grounds that plaintiff's own negligence (tripping and losing his footing) and/or Track's negligence (failing to properly measure and cut the wooden pole to a length that would not come into contact with the overhead line) are intervening causes that preclude proof of proximate cause and thus preclude liability on the part of the Utilities.  Plaintiff contends that this defense has been waived because the Utilities undisputedly did not include it in the pretrial order.  The Utilities contend that their assertion in the pretrial order that no acts or omissions of the Utilities "were the direct and proximate cause of the accident" is sufficient because "intervening cause is part of the defense of proximate cause."  The court rejects this argument and concludes that the Utilities have waived it.

---

[17]  This distinction is one that the Utilities recognize in their reply brief.  In that brief, the Utilities argue for the first time that a duty to insulate a power line arises only when the general public might come into contact with the line and not when contractors who are charged with knowledge of safety issues concerning transmission lines are working near those lines.  Because this argument appears for the first time in the Utilities' reply brief, the court does not address it.

The Tenth Circuit, applying Kansas law, has held that "[w]hether a party's intervening cause produced the injury in question is a defense for which the defendant bears the burden of proof." *See Roberts v. Printup*, 595 F.3d 1181, 1189–90 (10th Cir. 2010) (citing *Worden v. Union Gas Sys., Inc.*, 324 P.2d 513 (1958)). Thus, the Utilities bear the burden of proving an intervening cause of plaintiff's injuries. Proximate cause, on the other hand, is an element of plaintiff's claim on which he bears the burden of proof. *Rhoten v. Dickson*, 223 P.l3d 786, 801-02 (Kan. 2010). The absence of proximate cause, then, is not a "defense" as suggested by the Utilities and it does not incorporate the separate concept of intervening cause. *See Puckett v. Mount Carmel Regional Med. Ctr.*, 228 P.3d 1048, 1060 (Kan. 2010) (the issue of intervening cause does not arise until plaintiff has established cause-in-fact). Moreover, plaintiff was entitled to notice that the Utilities intended to assert a defense on which they bore the burden of proof and the pretrial order's reference to "proximate cause" was not sufficient to place plaintiff on notice of that defense. *See Blonder–Tongue Lab., Inc. v. Univ. of Ill. Foundation*, 402 U.S. 313, 350 (1971) (purpose of pleading an affirmative defense is to give the opposing party notice of the defense and a chance to argue, if he can, why the imposition of the defense would be inappropriate). In the absence of any suggestion from the Utilities that plaintiff otherwise had notice of the affirmative defense, the Utilities' failure to include this affirmative defense in the pretrial order has resulted in a waiver of the defense. *See Cortez v. Wal–Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006) (defenses not included in the pretrial order are waived).

Finally, the Utilities advance a one-sentence argument that "there was no act or omission of the Sunflower Defendants that brought about the accident." In their reply, the Utilities clarify that this argument mirrors their argument that plaintiff's accident and injuries were not

foreseeable. For the reasons stated above, disputed issues of fact exist concerning the foreseeability of plaintiff's accident and injuries. Summary judgment on this issue is denied. *See Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86 (1983) (causal connection between duty breached and injuries sustained is a question of fact); *McDermott v. Midland Management, Inc.*, 997 F.2d 768, 771 (10th Cir. 1993) (issues involving proximate cause and foreseeability are ordinarily questions of fact for the jury under Kansas law).

D.    *Punitive Damages*

Lastly, the Utilities assert that plaintiff cannot establish willful or wanton conduct for purposes of his claim for punitive damages. The argument is summarily denied, as the Utilities have not set forth any substantive argument relating to this issue but simply incorporate by reference Power's motion for summary judgment on this issue. Power's motion, however, did not raise any legal arguments regarding punitive damages that might apply to the Utilities. Rather, Power's motion raised only factual issues based on Power's conduct in this case. Nothing in Power's motion relates to the Utilities' conduct in this case for purposes of plaintiff's punitive damages claim. The Utilities also incorporate by reference their arguments concerning "issues of foreseeability." The court, however, has rejected those arguments and the Utilities have not demonstrated how those arguments entitle them to summary judgment on plaintiff's claim for punitive damages.

*E.* *Conclusion*

For the foregoing reasons, a trial is required on plaintiff's negligence claims against the Utilities. Because the court is denying the Utilities' motion for summary judgment, the court necessarily rejects the Utilities' argument that plaintiff's claim for loss-of-consortium damages fails as a derivative claim. The denial of the Utilities' motion for summary judgment also permits the court to moot any and all remaining objections lodged by plaintiff to evidence submitted by the Utilities in support of their motion for summary judgment or in connection with their reply brief. For even if the court considers all of the evidence submitted by the Utilities, the record nonetheless contains evidence from which a jury could return a verdict in favor of plaintiff on his negligence claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's motion for partial summary judgment (doc. 418) is **denied**; Power's motion for summary judgment (doc. 420) is **granted**; the Utilities' motion for summary judgment (doc. 423) is **denied**; Power's motion to exclude expert testimony (doc. 433) is **moot;** Power's motion to strike or disregard the affidavit of Donald R. Johnson (doc. 437) is **moot**; plaintiff's motion to ignore inadmissible evidence (doc. 439) is **moot**; plaintiff's motion to ignore portions of Power's reply and to ignore new evidence (doc. 477) is **moot**; and plaintiff's motion to ignore portions of the Utilities' reply and to ignore new evidence (doc. 476) is **granted in part and moot in part**.

**IT IS SO ORDERED.**

31

Dated this 15th day of June, 2017, at Kansas City, Kansas.

                                        s/ John W. Lungstrum
                                        John W. Lungstrum
                                        United States District Judge